## No. 13,423.

### HORTON, COUNTY TREASURER *v.* McFERSON, BANK COMMISSIONER.

(30 P. [2d] 256)

Decided February 19, 1934.

Messrs. SMITH, BROCK, AKOLT & CAMPBELL, Mr. R. A. DICK, for plaintiff in error.

Mr. CHARLES M. ROSE, for defendant in error.

*In Department.*

MR. CHIEF JUSTICE ADAMS delivered the opinion of the court.

HORTON, as treasurer of El Paso county, brought an action in accounting against McFerson, as state bank commissioner, who is in possession of the assets of the State Savings Bank of Colorado Springs to liquidate its affairs. The court found the issues for McFerson and rendered judgment accordingly. Horton brings error. We refer hereinafter to Horton as the treasurer, to McFerson as the commissioner and to the State Savings Bank of Colorado Springs as the bank.

The facts are undisputed. When the bank closed its doors and the commissioner took charge, the treasurer had $39,233.90 of monies belonging to El Paso county on deposit in the bank. The bank owned Liberty bonds in the principal sum of $25,000, and before the commissioner took charge of its affairs, the bank had used the bonds to secure the treasurer's deposits up to the amount of $25,000. This was done by delivering these securities to and leaving them with the First National Bank of Colorado Springs as trustee under a trust agreement, a part of which we quote as follows:

"Whereas the party of the first part herein [the State Savings Bank of Colorado Springs] is desirous of securing deposits from the party of the second part herein [the treasurer of El Paso county]; and whereas the party of the second part herein is desirous of depositing money in the bank of the party of the first part in a sum *not to exceed Twenty-five Thousand Dollars ($25,-000.00);* and whereas the party of the first part has agreed to secure the party of the second part against any loss because of *such* deposits *up to the amount of Twenty-five Thousand Dollars ($25,000);* and whereas it has been agreed that the property hereinafter described shall be turned over and delivered to the said Trustee [The First National Bank of Colorado Springs] as security to the party of the second part against any loss because of *said* deposits. (All of the above italics are ours.)

"Now Therefore, * * * The party of the first part does hereby convey and deliver to the said Trustee the following described Fourth Liberty Loan Bonds of the United States, to wit: (Here follows description of the bonds in detail.) * * *

"4. The said Trustee is hereby expressly authorized, in the event that the said party of the first part should fail to pay the party of the second part, or his order, said deposit or any part thereof, to sell the above described liberty bonds at the best market price available, and to apply the proceeds thereof, first, to the payment of any loss sustained by the party of the second part because of said deposit, and, second, the overplus, if any, shall be paid to the party of the first part."

The court found the market value of the bonds to be $25,671.88, plus accrued interest. The court also found and decreed that the commissioner is entitled to redeem the bonds upon payment of the sum of $25,000; that the commissioner had tendered that amount to the treasurer for the redemption of the bonds, which offer the latter had refused to accept. The court ordered that the bonds be sold for their market value and for not less than

$25,000 without further order of court; that $25,000 of the proceeds thereof be delivered to the treasurer, the overplus, if any, to be paid to the commissioner; that the treasurer's claim theretofore filed with the commissioner be allowed in the sum of $39,233.90 less the proceeds of the bonds up to the sum of $25,000; that the commissioner pay to the treasurer a dividend of 50 per cent (such percentage being the total of dividends theretofore declared in the administration of the estate); that the dividend be computed on the balance due the treasurer after crediting the amount received for the liberty bonds. The effect of the decree was to allow the treasurer $25,000 as a secured claim and $14,233.90 as an unsecured claim, dividends to be computed on the last named amount. The decree of court is in strict accordance with what the commissioner had tried to get the treasurer to agree upon before suit was brought, but the latter refused and continues his objections to the settlement as ordered by the court.

The treasurer contends that his claim should have been allowed in the full sum of $39,233.90, dividends to be computed on that amount; that he has the right to share in the general assets before he exhausts his security; that if such assets are insufficient, he may then fall back on the liberty bonds to satisfy the balance of his claim, and after being thus paid the amount of $39,233.90, he says he will make no further claim on the liberty bonds. The treasurer assigns error because he was not permitted to follow the above plan. The above county deposits are also secured by a bond in the sum of $5,000 issued by a surety company, not involved in this case.

1. As to the pledged security, there was no reason for the county treasurer to expect the bank commissioner to offer anything more advantageous than the sum of $25,000 in cash, or for the treasurer to withhold his consent to the release of the security upon payment of 100 per cent of his secured claim. The commissioner's offer was in keeping with the agreement under which the

bonds were pledged and delivered to the trustee. By the plain language of that instrument, the parties defined at the outset the precise amount of the deposits then contemplated, and the limit and extent of the security. Such deposits and security were identical in the sum of $25,000. We call attention to the italicized portions of the paragraph of the trust agreement first above quoted. Under the usual canons of construction, all of the general language in the agreement that relates to the amounts of the deposits to be made and the security therefor, is limited and controlled by the specific sum fixed and expressly stated by the parties themselves. It follows that all deposits in excess of the sum of $25,000 were *not* secured by the trust agreement. The fund thereby created was available only for the purpose for which the trust was established and no mathematical computation can be devised to extend it beyond its intendment, or to make any portion of such fund available to cover unsecured claims.

2. When the trust is discharged, the commissioner as successor in interest to the pledgor, is entitled to the return of the pledged property. This business custom is too prevalent and well understood to require the citation of authorities. And a pledge to secure a specific debt cannot be held by the pledgee as security for any other obligation, except by express agreement between the pledgor and pledgee. 21 R. C. L. p. 653, §18; 49 C. J. p. 936, §77.

3. Counsel for the treasurer point to the fact that the county deposits amounted to nearly forty thousand dollars. They follow this statement with a history of the legislative acts of this state directing county treasurers to take bonds or other approved securities to protect public funds deposited in banks. Chapter 83, Session Laws 1927, page 280, et seq., directs that this be done; common prudence also commends such a precaution, but the statute has little if any bearing on the present controversy. The question now is not how much security the

treasurer should have taken, but how much he actually took, and the trust agreement furnishes the answer. It must be remembered that the liberty bonds are primarily assets of the bank, to which its custodian is entitled, subject only to the performance of the trust. Also, that if it should develop that the treasurer would receive more money under his plan, other depositors would receive correspondingly less. If the treasurer has failed or been unsuccessful in obtaining adequate security, as required by law, he cannot visit his misfortune upon other unsecured depositors. As to the unsecured claim of the county, it is on a parity with the claims of other unsecured creditors. *Board of County Commissioners v. McFerson,* 90 Colo. 408, 9 P. (2d) 614.

4. We are favored by counsel with exhaustive and carefully prepared briefs, showing divergent rules followed in various jurisdictions on the subject of the rights of creditors to share in the general assets of insolvent concerns before exhausting their securities. Some of the authorities submitted undoubtedly would be highly instructive in the absence of an express contract prescribing the particular manner in which the liberty bonds are to be handled by the trustee, but with this valid trust agreement before us, clearly and unequivocally expressed, we need no other guide. Such agreement governs the rights of the parties; to disregard it would be an unwarranted interference with their contractual relations and with the judgment and decree of the court.

Judgment affirmed.

MR. JUSTICE BURKE and MR. JUSTICE HOLLAND concur.